IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

A. ZAHNER COMPANY,

    Plaintiff

v.

HENDRICK METAL PRODUCTS, LLC,

    Defendant.

Case No. 1:17-cv-4139

Jury Trial Demanded

**HENDRICK'S BRIEF IN SUPPORT OF ITS
MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1

II. LEGAL PRINCIPALS ........................................................................................... 2

    A. Patent Eligibility Under 35 U.S.C. § 101 Does Not Include Abstract Ideas .................... 2

    B. Motion For Judgment On The Pleadings ............................................................. 3

III. THE CLAIMED INVENTION ............................................................................. 3

IV. ARGUMENT ........................................................................................................ 4

    A. Claim Construction Is Not Necessary To Evaluate Patentability ...................... 4

    B. All Claims Are Directed To An Abstract Idea ................................................... 5

        1. The claims are directed to an idea about creating halftones ........................ 6

        2. The claimed halftone idea is an abstract idea ............................................... 8

    C. All Claims Lack Inventive Concept ..................................................................... 9

        1. The computer-features limitations do not impart inventive concept .......... 10

        2. The conventional field-of-use limitations do not impart inventive concept ............... 11

    D. The Claims Are Distinguishable From Patentable Claims ............................. 13

V. CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
　838 F.3d 1253 (Fed. Cir. 2016) ............................................................................ 12

*Alice Corp. v. CLS Bank Int'l*,
　134 S. Ct. 2347 (2014) ............................................................................... 2, 9, 10

*Bilski v. Kappos*,
　561 U.S. 593 (2010) ............................................................................................ 12

*buySAFE, Inc. v. Google, Inc.*,
　765 F.3d 1350 (Fed. Cir. 2014) ........................................................................ 3, 4

*Content Extraction and Transmission LLC v. Wells Fargo Bank, National Ass'n*,
　776 F.3d 1343 (Fed. Cir. 2014) ........................................................................ 5, 8

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
　758 F.3d 1344 (Fed. Cir. 2014) .............................................................................. 8

*Elec. Power Grp., LLC v. Alstom S.A.*,
　830 F.3d 1350 (Fed. Cir. 2016) ................................................................. 8, 10, 14

*Enfish, LLC v. Microsoft Corp.*,
　822 F.3d 1327 (Fed. Cir. 2016) ...................................................................... 13, 14

*Erickson v. Pardus*,
　551 U.S. 89 (2007) ................................................................................................ 3

*FairWarning IP, LLC v. Iatric Sys, Inc.*,
　839 F.3d 1089 (Fed. Cir. 2016) ............................................................................ 15

*In re TLI Commc'ns LLC Patent Litig.*,
　823 F.3d 607 (Fed. Cir. 2016) .............................................................................. 14

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
　850 F.3d 1332 (Fed. Cir. 2017) ................................................................. 8, 12, 14

*Lodholtz v. York Risk Servs. Grp., Inc.*,
　778 F.3d 635 (7th Cir. 2015) .................................................................................. 3

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
　566 U.S. 66 (2012) .......................................................................................... 2, 12

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
　837 F.3d 1299 (Fed. Cir. 2016) ................................................................. 13, 14, 15

*OIP Techs., Inc. v. Amazon.com, Inc.*,
   788 F.3d 1359 (Fed. Cir. 2015) .................................................................................. 3, 4, 5, 11

*RecogniCorp, LLC v. Nintendo* Co.,
   855 F.3d 1322 (Fed. Cir. 2017) .............................................................................................. 9

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
   873 F.3d 1364 (Fed. Cir. 2017) ............................................................................................ 12

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   No. 2016-2531, 2017 WL 4931936 (Fed. Cir. Nov. 1, 2017) ............................................. 3, 14

**<u>Statutes</u>**

35 U.S.C. § 101 ............................................................................................................................ 2

**<u>Rules</u>**

Fed. R. Civ. P. 12 ......................................................................................................................... 3

I.  INTRODUCTION

Zahner's claimed invention is a prototypical example of an abstract idea, which the Supreme Court deemed unpatentable in its seminal *Alice* decision. Its key concept involves halftone images—those pictures comprised of various-sized dots that are familiar to everyone who read a newspaper in the last 100 years. The '688 patent is not aimed at publishers, but at  architects and designers who want an image on a wall. The patent teaches that images should be  converted to halftone format (i.e., various-sized dots), and a machine should print the image into sheet metal by punching holes to correspond with the dots. The '688 patent's claims are practiced by the process that created the image on four building panels shown in Figure 2.

Using halftone images on metal surfaces through mechanical hole punching is not new. In fact, the '688 patent admits that conventional practices did just that, and that Zahner itself has been in the business of delivering architectural metalwork for more than 110 years (Dkt. No. 1 ¶ 8).

Instead, the '688 patent addresses the problem of the inefficient process by which humans converted image files into the halftone files for metal printing machines.[1] Although some simple images could be converted automatically to a collection of dots, most conversions involved a human dictating the dots' locations. At minimum, a human removed or adjusted dots in the halftone file to avoid windows or address other issues unique to the specific building surface into

---

[1] Given the posture of this motion, Hendrick assumes that the statements in the '688 patent are true, but only for the purpose of this motion. For the avoidance of doubt, Hendrick disagrees with certain statements and asserts that the patent's claims are neither novel nor non-obvious.

which the image would be printed. Humans are not perfect, so this process was "tedious" and "susceptible to human error." The '688 patent's solution to this problem was straightforward: use a computer to generate the printing machine's halftone files based on the human's input on how to traverse the building-surface issues.

As explained below, the '688 patent's claims are directed to the abstract idea of creating a halftone file for a printer from an image and from information about the printing surface. Beyond that, the claims simply claim (i) generic computing functionality to facilitate use of the idea, and (ii) conventional steps in the field of architectural metal work. Per binding authority, this is not patentable subject matter. No claim constructions can render these claims valid, so it is appropriate to invalidate the '688 patent at the pleading stage by granting Hendrick's motion.

## II.  LEGAL PRINCIPALS

### A.  Patent Eligibility Under 35 U.S.C. § 101 Does Not Include Abstract Ideas

Patents that claim abstract ideas—or add too little to such abstract ideas—are unpatentable under 35 U.S.C. § 101. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012). The Supreme Court requires a two-step framework for determining whether a patent claims patentable subject matter: the Court must first determine whether the claims at issue are directed to a patent-ineligible abstract idea; if so, it must consider the elements of each claim—both individually and as an ordered combination—to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). The second step is "the search for an 'inventive concept,'—i.e., an element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent upon the ineligible concept itself." *Id.*

2

**B. Motion For Judgment On The Pleadings**

A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion. *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, No. 2016-2531, 2017 WL 4931936, at *3 (Fed. Cir. Nov. 1, 2017) (deferring to regional circuit law on procedural aspects of Rule 12(c) motions). The Court must accept the factual allegations in the complaint and take them in the light most favorable to the non-moving party. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

In the context of a Rule 12(c) challenge to the validity of a patent under § 101, the analysis is generally limited to the face of the complaint, matters of judicial notice, and materials incorporated into the complaint by reference—namely, the patent at issue. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014). Patent eligibility under § 101 is an issue of law. *Id*.

**III.   THE CLAIMED INVENTION**

The '688 patent relates to attaching a halftone (i.e., dot-based) image to the side of a building. ('688 patent col. 1 ll. 8–47.[2]) It discloses a series of steps for converting an image file—for example, a digital photograph—into a file format understandable to a machine that can print a likeness of the image into a building material—for example, by pressing indentations into metal. (*Id*. at Abstract, col. 4 l. 14.) The image file can be in JPEG or any of the well-known file formats, and the control files read by the machine are written in "machine code." (*Id*. at Abstract, col. 1 ll. 16–19; col. 4 ll. 18–22.)

---

[2] Citations to "the '688 patent" refer collectively to the original patent and the reexamination certificate, which were attached to the complaint at Dkt. Nos. 1-1 and 1-2. Citations to the patent's specifications and claims 2, 8–10, 15 and 16 (which were not reproduced in the reexamination certificate) are to Dkt. No. 1-1. Citations to all other claims are to Dkt. No. 1-2.

According to the patent, existing methods of generating the machine code required too much human labor. (*Id.* at col. 1 ll. 20–39.) Although machine-code creation was automated to some degree, human involvement was routine. (*Id.*) Generating machine code by hand was tedious and prone to error, so the '688 patent sought a way to avoid these human pitfalls. (*Id.*)

The patent discloses and claims a computer program that generates a control file from an image file more efficiently than a human can. (*See id.* at col. 1 ll. 43–51; col. 3 ll. 26–55; fig. 7.) The computer program receives a previously created image file, such as one from a digital camera (steps 7a and 7b). (*Id.* at col. 7 ll. 9–17; fig. 7.) Next, the program converts the image file to an intermediate file, which is comprised of "a series of dots" (step 7c). (*Id.* at col. 4 ll. 23–24; col. 7 ll. 24–25; fig. 7.) Thereafter, the intermediate file is modified, based on input about the real-world environment where the image will eventually be printed (steps 7d–7f). (*Id.* at col. 7 ll. 25–31; fig. 7.) Finally, the program converts the intermediate file (as modified) into the control files (steps 7g). (*Id.* at col. 7 ll. 31–35; fig. 7.)

## IV. ARGUMENT

The '688 patent is precisely the type of patent that the Federal Circuit has routinely invalidated under the abstract-idea prohibition of § 101. In particular, under *Alice*'s two-part test, the patent's claims are directed to the abstract idea of creating a halftone file for a printer from an image and from information about the printing surface. Beyond that—under the most generous reading of the claims—only generic computing functionalities (e.g., displaying data) and conventional field-of-use steps remain. This is insufficient.

### A. Claim Construction Is Not Necessary To Evaluate Patentability

The Court need not wait until claim construction to assess the patentability of the '688 patent. Courts routinely invalidate patents for failing to claim patentable subject matter at the pleading stage. *E.g., OIP Tech.*, 788 F.3d 1359 at 1360; *buySAFE*, 765 F.3d at 1351. First, there

is no requirement that the district court engage in claim construction before deciding § 101 eligibility. *Content Extraction and Transmission LLC v. Wells Fargo Bank, National Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). Second, policy dictates early dismissal of invalid patents:

> ***Failure to recite statutory subject matter is the sort of "basic deficiency," that can, and should, "be exposed at the point of minimum expenditure of time and money by the parties and the court"***…. I commend the district court's adherence to the Supreme Court's instruction that patent eligibility is a threshold issue, by ***resolving it at the first opportunity***.

*OIP Tech.,* 788 F.3d at 1364–65 (Mayer, J. concurring) (citations and modifications omitted). [3]

Claim construction disputes may arise where a patent holder tries to narrow an abstract claim. Here, the claims are certainly broad for § 101 purposes: they could arguably be performed by a human with basic office supplies. For example, a person could practice the claim using a pencil, eraser, and scissors by creating a stencil for a screen printing machine from a conventional picture (on photographic paper) via a tracing-paper step.

However, this brief reads the claims narrowly. For example, since the various "files" described in the specification are digital files (i.e., computer-readable files), Hendrick assumes for purpose of this brief that the claims require digital files and any associated requirements described in the patent's specification. The claims of the '688 patent are invalid even under this narrow reading.

### B.  All Claims Are Directed To An Abstract Idea

All non-canceled claims of the '688 patent—claims 1–3 and 5–20—are directed to the abstract idea of creating a halftone file for a printer from an image and from information about the printing surface. This concept is similar to those deemed abstract by the Federal Circuit, and it is distinguishable from those that have passed the *Alice* test.

---

[3] All emphasis added unless otherwise noted.

5

### 1. The claims are directed to an idea about creating halftones

All claims are concerned with converting an image from an initial image file to a printer control file that represents the image as a halftone image (i.e., a dot-based image). Every claim involves receiving an image, converting the image to a halftone image, soliciting or acquiring information about the surface onto which the halftone will be printed, modifying the halftone image based on information about the surface, and converting the modified halftone image into a control file for a printer. (*See* '688 patent at claims 1, 11, 14, 17, 18.) Some claims involve using the control file to actually print the halftone image on the surface. (*Id.* at claims 8, 13, 16.)

Consider claim 17, which is exemplary. First, an image file is received, which will become the basis for the halftone to be imparted into the building surface:

> A method of transferring a representation of an image to a surface, the method comprising the steps of:
> a) receiving the image as an image file.

Next, the image is converted to a conventional halftone image. The claim does not say who or what does this conversion, but reading the claim narrowly, Hendrick assumes it is a computer running software (*see* Section IV.A). The claim does not say how—that is, by what algorithm—the halftone is created, and since the specification is silent on the issue, it remains a mystery. Here's the step:

> b) converting the image file to an intermediate file comprising a series of dots that vary in dimensional size according to the image.

The halftone image needs to be adjusted to the surface onto which it will be printed, and that requires user input. The method displays the halftone image so that a user can see the dots (presumably on a computer monitor) and provide feedback on how the dots need to be adjusted (presumably with a mouse and keyboard):

> e) displaying the dots for manipulation by a user.

There are other surface-based adjustments that need to be made, such as scaling the halftone to the right dimension for the printing surface. Neither the claims nor the specification say how these other modifications occur—they just happen:

> c) scaling the intermediate file to the surface
>
> d) dividing the intermediate file into a plurality of subcomponents, wherein each of the sub-components corresponds to one of a plurality of individual sheets that are to be combined to form the surface and the surface is larger than a machine can handle…
>
> f) manipulating the dots to accommodate features of the surface.

Finally, having been adjusted, the halftone image is converted into a file format that can be understood by a machine that can print dots into a surface:

> g) converting the intermediate file into at least one control file, the control file being operable to be utilized by the machine to physically manipulate the surface according to the dots, thereby transferring the representation to the surface.

(*See* '688 patent at claim 17.) This same basic process is present in all the claims:

| Claims | Receiving image | Soliciting information | Modifying halftone |
| --- | --- | --- | --- |
| | **Creating halftone** | **Creating control file** | |
| 1–2, 5–10 | a) receiving the image… | c) displaying… the dots… | c)… manipulating the dots… |
| | b) converting the image file… | d) converting the intermediate file… | e) scaling the intermediate file… |
| 11–13 | a) receiving the image… | e) displaying… the dots… | c) scaling the intermediate raster file… |
| | b) converting the image file… | d) associating the dots… f) generating a plurality of control files… | e)… manipulating the dots… |
| 14–16 | a) receiving the image… f) … form indicia independent of the image | h) displaying the dots… | c) scaling the intermediate raster file… d) dividing the intermediate raster file… e) associating each sub-component… i) manipulating the dots… j) manipulating the dots… k) manipulating the dots… |
| | b) converting the image file… | g) associating the dots… l) generating a plurality of control files… | |
| 17–20 | a) receiving the image… | e) displaying the dots… | c) scaling the intermediate file… |

| Claims | Receiving image | Soliciting information | Modifying halftone |
|--------|-----------------|------------------------|--------------------|
|        | Creating halftone | Creating control file |                  |
|        | b) converting the image file… | g) converting the intermediate file… | d) dividing the intermediate file…<br>f) manipulating the dots… |

Thus, every claim involves creating a halftone file for a printer from an image and from information about the printing surface. As explained below, this is an abstract idea.

### 2. The claimed halftone idea is an abstract idea

Creating a halftone file for a printer from an image and from information about the printing surface is an abstract idea. It simply involves taking at least two sets of information (the image and information about the surface) and creating a new set of information (the control file for the printer).

Such data-processing claims are abstract. For example, *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014), concerned a "method of generating a device profile that describes properties of a device." *Id*. The "device profile" was created by combining "first data" with "second data"—each of which described information about the device. *Id*. The claims were abstract because, without more, a process that uses algorithms "to manipulate existing information to generate additional information is not patent eligible." *Id. See also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (finding claims abstract that were "at their core, directed to the abstract idea of collecting, displaying, and manipulating data"); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (finding claims abstract that were focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis"); *Content Extraction*, 776 F.3d at 1347 (concept of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" is abstract).

The asserted claims are analogous to those invalidated in *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322 (Fed. Cir. 2017). Those claims concerned a method of creating a composite image, like a face in a police sketch (comprising a certain eye shape, a certain lip type, etc.). *Id*. at 1324. First, the method displayed various facial-feature images, each of which was associated with a code. *See id*. Second, a subset of the facial-feature images were selected to form a composite image, where the composite image was associated with a composite code derived from the codes of the constituent facial-feature images using a mathematical formula. *See id*. Finally, the composite image was reproduced at a different location using the composite code. *Id*. The claims were directed to an abstract idea because "[a] process that started with data, added an algorithm, and ended with a new form of data was directed to an abstract idea." *Id*. at 1327.

The same can be said the '688 patent's claims. Just like the *RecogniCorp* claims, the '688 patent's method starts with image data. Both methods then display image data and seek information on what to do with the image data. And, both methods create a new set of image data based on the initial image data and the inputted information. Thus, as in *RecogniCorp*, the '688 patent's claims are directed to an abstract idea because they concern the conversion of data into a new form based on input about the image data.

Consequently, the claims of the '688 patent are directed to the abstract idea: creating a halftone file for a printer from an image and from information about the printing surface. These claims can only be directed to patentable subject matter if they add some "inventive concept." *Alice*, 134 S. Ct. at 2355. As explained below, they do not.

### C. All Claims Lack Inventive Concept

Once an abstract idea is identified, the court must examine the elements of the claim to determine whether it contains an "inventive concept" sufficient to "transform" the claimed abstract idea into a patent-eligible application. *See Alice*, 134 S. Ct. at 2357. Simply taking an abstract idea

and adding requirements that involve "well-understood," "routine," or "conventional" activity contributes nothing inventive to an otherwise abstract idea, leaving only the abstract idea as the subject matter of the claims. *See id.* Across all '688 patent claims, the only concepts added to the abstract idea concern the computer features applied and conventional activities in the field. These are insufficient under *Alice*.

### 1. The computer-features limitations do not impart inventive concept

At bottom, the '688 patent claims the use of a generic computer to perform functions that humans previously performed more slowly and less accurately. ('689 patent col. 1 ll. 12–53.) Across the claims, the '688 patent requires various computing functions. The computer receives files, converts files from one format to another, displays data, receives user instructions, and acts on user instructions. These are prototypical conventional computing activity and, thus, fail to add an inventive concept to the abstract idea. *See Elec. Power Grp.*, 830 F.3d at 1355 ("collection, analysis, and display" of information is generic computing functionality).

The patent itself says that no step requires more than generic computing functionality. The image file to be processed can be any "***common file format***, such as TIFF, JPEG, GIF, and BMP." ('689 patent col. 4 ll. 14-23.) It is transferred into the computing environment for processing via any of the "***commonly used methods***" (*Id*. at col. 7 ll. 20-21.) And the claimed method that acts on that data can be performed with on "***conventional personal computers***," and can be incorporated into any off-the shelf computer-aided-design software, "***such as AutoCad from Autodesk, Inc***." (*Id.* at col. 3 l. 66-col. 4 l. 13.) Thus, the claims lack inventive concept, just like those in *Electric Power Group*, where the claims required only off-the-shelf, conventional computer technology for gathering, analyzing, and displaying the desired information. *Elec. Power Grp.*, 830 F.3d at 1355.

To be clear, the '688 patent neither discloses nor claims new ways for the computer to perform the steps. *See* Section IV.D below. Indeed, the claims do not disclose *any way whatsoever*—let alone a new way—that most steps are performed. *Section* IV.B.1 above. For example, the image file is just "converted." The dots are just "displayed."

The patent is silent on these issues because they are irrelevant to the purported invention: the claims merely describe the automation of previous methods. The specification states that machine code—the instructions for where to print the dots of the halftone image—traditionally "must be generated almost completely by hand." ('688 patent at col. 1 ll. 32–39.) This process was "extremely tedious" and "susceptible to human error." (*Id*.) The '688 patent emphasizes that the key distinguishing feature of the claims is the ability to automate the creation of the machine code to avoid the tedium and error inherent in the human-centric method. (*See id*. at col. 1 ll. 43–47.) This does not impart inventive concept: "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible." *OIP Tech.*, 788 F.3d at 1363.

Thus, the computer-functionality limitations add nothing to the abstract idea other than conventional steps specified at a high level of generality, so they fail to impart any inventive concept that could render the claims eligible for patent protection.

### 2. The conventional field-of-use limitations do not impart inventive concept

Although the claims are directed to using the claimed abstract idea in the field of architectural metalwork, that does not save their validity.[4] Specifically, each claim says that (1)

---

[4] As with the assumed computing elements, this is a generous assumption. For example, claim 1 just requires that "a surface" be "physically manipulate[d]." ('688 patent at claim 1.) There is no mention that the surface is metal or other material that could be affixed to a wall, and there is no requirement that the manipulation be indentations, holes, or the like. But since we read the claims narrowly in this brief, we assume the claims are limited in this way. *See* Section IV.A.

the processed halftone image data is used by a machine that makes markings on building surfaces, (2) the surface is comprised of a set of metal sheets, and/or (3) the halftone dots can be printed as several type of markings (e.g., holes, bumps, indentations). (*See* '688 patent at col. 1 ll. 8–11; claims 1, 11, 14, 17, 18.) These limitations add no inventive concept.

First, "limiting an abstract idea to one field of use or adding token postsolution components [does] not make the concept patentable." *Bilski v. Kappos*, 561 U.S. 593, 612 (2010) (invalidating claims limited to fields of commodities and energy markets). For example, in *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1368 (Fed. Cir. 2017), the claims concerned improvements to open-payment fare systems in mass transit networks. *Id*. *Smart Systems* rejected the patent holder's contention that the claims were patentable because "they apply to a particular, concrete field—namely, mass transit," because "merely limiting the field of use of the abstract idea to a particular environment does not render the claims any less abstract." *Id*. at 1373 (internal quotations omitted). *See also Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258–59 (Fed. Cir. 2016) (invalidating claims limited to field of cell phones).

Second, adding "well-understood, conventional and routine" activities in the industry does not add an inventive concept. *See Mayo Collaborative Servs.*, 566 U.S. at 79; *Intellectual Ventures I*, 850 F.3d at 1341. As the '688 patent explains, people in this field have always used image data to create files for machines that print markings into metal sheets for building surfaces. ('688 patent at col. 1 ll. 13–37.) The claimed method and the prior method both start with an image. (*Id*. at col. 1 ll. 13–37; col. 3 ll. 7–18.) Both methods involve converting the image to a format comprised of discreet points (i.e., a dot-based format). (*Id*.) Both methods require the user to indicate how dots representing an image should be modified to accommodate the target surface. (*Id*.) Both methods convert data to a control file that tells a dot-printing machine where to print the dots. (*Id*.) Both

methods involve printing on metal sheets used to clad buildings. (*Id*.) The '688 patent is clear about how the old method departs from the claimed invention: a *computer* constructs the control file rather than the human. (*See id.* at col. 1 ll. 13–53.) But that is not inventive for reasons already explained.

Thus, the '688 patent itself admits there is nothing inventive about the steps that limit the abstract idea to the field of image transfer for architectural applications, because they are well-understood, conventional and routine activities for transferring an image to a building materials.

### D. The Claims Are Distinguishable From Patentable Claims

The '688 patent is distinguishable from those that claim patentable subject matter. Claims directed to a "specific asserted ***improvement in computer capabilities***" and not "an 'abstract idea' for which ***computers are invoked merely as a tool***" may be patentable. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016). And claims that improve an existing process through the "automatic use of rules ***of a particular type***" rather than the through "the use of the computer" may also be patentable. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). The '688 patent claims neither.

The '688 patent merely uses a computer as a tool, so it is distinguishable from the *Enfish* patent. 822 F.3d at 1339. The *Enfish* patent claimed ***how*** a computer can store information, not a method that simply took advantage of a computer's generic ability to store information. *Id*. As a result, its claims were "directed to an improvement in the functioning of a computer." *Id*. at 1338.

Unlike the claims at issue in *Enfish*, the '688 patent claims use generic computer functionality to automate a conventional practice. The '688 patent claims do not indicate how any of the functions are to be performed. In particular, the claims require the functional results of "receiving," "displaying," "scaling," "dividing," "manipulating," and "converting," but they are silent on how these results are achieved. Such functional language is a hallmark of abstract claims.

> [T]he claims recite…a series of generic computer "components" that merely restate their individual functions—i.e., organizing, mapping, identifying, defining, detecting, and modifying. That is to say, ***they merely describe the functions of the abstract idea itself, without particularity***. This is simply <u>***not enough***</u> under step two.

*Intellectual Ventures I*, 850 F.3d at 1341; *Two-Way Media*, No. 2016-2531, 2017 WL 4931936, at *4 ("The claim requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 615 (Fed. Cir. 2016) ("vague, functional" terms insufficient to confer eligibility). Thus, the '688 patent's claims do not offer a new way for a computer to perform its core functions, but instead they simply use a computer "as a tool," which does nothing to save their validity. *Enfish*, 822 F.3d at 1335–36.

The '688 patent claims are also distinguishable from those at issue in *McRO*. The patents in that case were directed to a new process of automated 3-D computer animation, in which "a combined order of specific rules" was applied to create a sequence of animated characters. *McRO*, 837 F.3d 1315. The Court held that the asserted claims contained not merely a prescription for performance of a method, but an adequate description of *how* the methods were to be achieved. *Id.*; *accord Elec. Power*, 830 F.3d at 1355 ("Inquiry therefore must turn to any requirements for *how* the desired result is achieved" (emphasis in original)).

Unlike the claims in *McRO*, the '688 patent's claims merely automate prior methods. Like the old, human-focused method, the claimed method starts with an image file, converts an image to halftone, determines needed modifications, converts the halftone to a control file that tells a dot-printing machine where to print the dots. The patented method just accomplishes these steps more efficiently with the use of a computer. So, although the '688 patent's claims and those of *McRO* may increase accuracy and efficiency, the '688 patent's improvements merely come from the use of a computer to facilitate the claimed steps, whereas the *McRO* improvements come from the

steps themselves. *See McRO*, 837 F.3d at 1314 (improvement comes from "the incorporation of the claimed rules, not the use of the computer"); *see also FairWarning IP, LLC v. Iatric Sys, Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (claims invalid where increase in efficiency "comes from the capabilities of a general-purpose computer, rather than the patented method itself.").

Thus, unlike in *Enfish* and *McRO*, the '688 patent claims an abstract idea without inventive concept.

## V.  CONCLUSION

For the reasons articulated above, the Court should find all claims of the '688 patent invalid for claiming unpatentable subject matter and grant judgment in Hedrick's favor.

Dated this 22d day of November, 2017.        Respectfully submitted,

/s/ *David R. Cross*
David R. Cross
david.cross@quarles.com
Johanna Wilbert (*pro hac vice* application pending)
johanna.wilbert@quarles.com
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2350
Milwaukee, Wisconsin 53202
Tel: (414) 277-5000
Fax: (414) 271-3552

Louis A. Klapp
louis.klapp@quarles.com
QUARLES & BRADY LLP
300 North LaSalle Street, Suite 4000
Chicago, Illinois 60654
Tel: (312) 715-2712
Fax: (312) 632-1948

ATTORNEYS FOR DEFENDANT
HENDRICK METAL PRODUCTS, LLC

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 22, 2017, I caused the foregoing to be electronically filed with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

<u>*/s/ David R. Cross*</u>