## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| A. ZAHNER COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 17 C 4139 |
| | ) |
| HENDRICK METAL PRODUCTS, LLC, | ) |
| | ) Judge Rebecca R. Pallmeyer |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff A. Zahner Company sued Defendant Hendrick Metal Products, LLC for patent infringement. The patent at issue describes "a computer program and method" for generating machine code, which in turn must be usable for the purpose of "transfer[ring] a representation of an image to a building." Defendant has moved [24] for judgment on the pleadings, arguing that the claims at issue are invalid because they are directed to "abstract" subject matter and do not add the type of "inventive concept" necessary for patent eligibility under 35 U.S.C. § 101. For the reasons explained below, Defendant's motion is granted in part and denied in part.

### BACKGROUND

Plaintiff Zahner is a Missouri corporation with its principal place of business in Kansas City, Missouri. (Am. Compl. [40], at ¶ 3.) The company manufactures and sells "crafted architectural metalwork for designers around the globe." (*Id.* at ¶ 8.) Some of the company's products are metal sheets that feature complex images made from a series of holes, bumps, and indentations in the metal. One such product appears below:



(Pl.'s Tech. Demonstrative 8.)

Defendant Hendrick, a Delaware limited-liability company with its principal place of business in Elgin, Illinois, manufactures and sells "perforated and fabricated metal products for commercial and industrial applications." (*Id.* at ¶¶ 4, 14.) In October 2014, representatives of Hendrick and Zahner discussed a licensing arrangement of some kind—the Amended Complaint provides no details on this discussion or the proposed arrangement—but the deal subsequently fell apart. (*Id.* at ¶ 15.) At some point—again, the Amended Complaint does not provide any details—Hendrick produced "a multi-panel installation of stylized animal images at the Mayo Clinic Square building in Minneapolis, Minnesota." (*Id.* at ¶ 17.) The installation appears in the image below:



(Pl.'s Tech. Demonstrative 9.) Zahner now alleges that Hendrick used a method to produce this installation that directly infringes "at least claims 1, 2, 5, 6, 7, 8, 9, 11, 12, 13, 17, and 18" of United States Patent No. 7,212,688 (hereafter "'688 patent"), of which Zahner is the assignee. (*Id.* at ¶¶ 1-2.)[1]

## I.     Zahner's patent

The '688 patent is titled "Computer Program and Method for Converting an Image to Machine Control Data." '688 patent, at [54]. It generally relates to "a computer program and method" for generating machine code, which can then be used to "transfer a representation of an

---

[1] The '688 patent first issued on May 1, 2007 and subsequently received an *ex parte* reexamination certificate on August 27, 2014. (Ex Parte Reexamination Cert. (hereafter "Reexam. Cert."), Ex. 2 to Compl. [1-2].) Upon reexamination, the patent examiner cancelled claims 3 and 4; amended claims 1, 5-7, and 11-14; and added claims 17-20. (*Id.*) All of this court's citations to the patent's title, abstract, specifications, and claims 2, 8-10, 15, and 16 refer to the original '688 patent. All citations to claims 1, 5-7, 11-14, and 17-20 refer to the reexamination certificate.

3

image to a surface of a building." *Id.* col. 1 ll. 46-47. As explained in the "Background of the Invention" section of the patent, "[b]uilders and architects are increasingly using metal sheets to clad buildings." *Id.* col. 1 ll. 13-14. To "provide an aesthetic façade," these metal sheets are sometimes "manipulated" by a machine "to impart bumps" that form a pattern. *Id.* col.1 ll. 14-17. Transferring patterns to the metal sheets requires "highly complex machine code . . . to control the machine." *Id.* col. 1 ll. 17-21. The code for complex patterns "must be generated almost completely by hand." *Id.* col. 1 ll. 32-33. Such hand generation of code "is extremely tedious and even more susceptible to human error." *Id.* col. 1 ll. 34-35. While the code for simpler images can be generated automatically, it too must be "checked for errors." *Id.* col. 1 ll. 24. Often, it also must be "modified to accommodate features of a building," such as doors or windows. *Id.* col. 1 ll. 24-25.

The '688 patent outlines a process for converting an existing image into machine code that purportedly "overcomes the above-identified problems." *Id.* col. 1 ll. 43-44. The flow chart in Figure 7 "shows the functionality and operation of a preferred implementation" of the process:



FIG. 7

'688 Patent fig. 7, col. 6 ll.63-64.

The patent specifications describe each step of this process in detail. First, at step 7a, the user "takes or otherwise creates" an image file—for example, by taking a digital photograph or by using a scanner to convert an existing image into an image file. '688 patent col. 7 ll. 9-12, 20-21. Next, at step 7b, this image file "is then received in the computer equipment and made available to the program." *Id.* col. 7 ll. 13-14.

At step 7c, the program "converts the image file [into a] raster file,"[2] which consists of "a series of dots" that vary in size and are "preferably arranged according to a predetermined grid."

---

[2] The term "raster file" is not defined in the '688 patent. There have been no claim construction proceedings in this case. Without prejudice to either side's interpretation of the word "raster" in the patent, the court notes the following dictionary definition: "a scan pattern (as of the electron beam in a cathode-ray tube) in which an area is scanned from side to side in lines from top to bottom; *also*: a pattern of closely spaced rows of dots that form the image on a cathode-

5

*Id.* col. 7 ll. 24-25, col. 4 ll. 23-24. The raster file is then "scaled," at step 7d, to correspond to the size of the surface (or the portion of the surface) to which the image will eventually be transferred. *Id.* col. 4 ll. 27-33.

At step 7e, the user divides the raster file into "sub-components," each of which "correspond[s] to a different portion of the image" and can be modified individually without affecting the other sub-components. *Id.* col. 4 ll. 53-59, col. 7 ll. 27-28. The dots in each sub-component are then "manipulated" by the user, at step 7f, "to accommodate features of the surface, such as windows and doors," or "to produce a logo or other indicia independent of the image." *Id.* col. 4 ll. 60-64, col 7 ll. 29-31. These dots "are associated with markings that will be transferred to the [metal] sheets in order to create the representation of the image, once the sheets are assembled to cover the surface." *Id.* col. 5 ll. 32-34. "Once the dots have been manipulated" according to the user's directions, "the program generates a control file for each sub-component" at step 7g. *Id.* col. 5 ll. 51-55, col. 7 ll. 31-35. These control files contain the machine code "from which the machine may transfer the markings onto the corresponding sheet," *id.* col. 5 ll. 54-55, thereby "imparting the representation to the surface," *id.*, col. 7 ll. 34-35.

These steps—converting an image into a computer file that displays the image as a series of dots, sizing the image to fit a surface, dividing the overall image into pieces, manipulating the dots in each piece to accommodate the surface's design elements, and then converting the computer file into a format that can be read by another machine—make up the core of the invention claimed by the '688 patent. Independent claim 17, for example, reads as follows:

> 17. A method of transferring a representation of an image to a surface, the method comprising the steps of:
> a) receiving the image as an image file;

---

ray tube (as of a television or computer display)." *Raster*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1997). According to Encyclopaedia Britannica, "[r]aster graphics, also called bitmap graphics, [are] a type of digital image that uses tiny rectangular pixels, or picture elements, arranged in a grid formation to represent an image." *Raster graphics*, ENCYCLOPAEDIA BRITANNICA, https://www.britannica.com/technology/raster-graphics (last visited July 20, 2018).

- b) converting the image file to an intermediate file comprising a series of dots that vary in dimensional size according to the image;
- c) scaling the intermediate file to the surface;
- d) dividing the intermediate file into a plurality of sub-components, wherein each of the sub-components corresponds to one of a plurality of individual sheets that are to be combined to form the surface and the surface is larger than a machine can handle;
- e) displaying the dots for manipulation by a user;
- f) manipulating the dots to accommodate features of the surface; and
- g) converting the intermediate file into at least one control file, the control file being operable to be utilized by the machine to physically manipulate the surface according to the dots, thereby transferring the representation to the surface.

Reexam. Cert. col. 3 ll. 5-25. Independent claim 18 is virtually identical to claim 17, except that it specifies that the "intermediate" file is "a different file format than the image file."[3] *Id.* col 3 ll. 27-28, col. 4 ll. 1-14. Independent claim 1, meanwhile, simply combines steps (e) and (f) from claim 17 into a single step 1(c), combines steps (c) and (d) into a single step 1(e), and moves step (g) forward in the process, to step 1(d). Reexam. Cert. col. 1 ll. 25-43.

Independent claim 11 is slightly more complicated. It similarly combines steps (c) and (d) from claim 17 into a single step 11(c), and combines steps (e) and (f) into a single step 11(e). It also adds a new step (d) that involves "associating the dots with markings selected from the group consisting of indentations, holes, and bumps according to the image, wherein each of the dots represents at least one of the markings," and moves the step involving conversion of the manipulated intermediate file into control files to step 11(f), and specifies that "a plurality of control files" are generated instead of a single control file. The claim further states, in its preamble, that the "method" is one for "transferring a representation of an image to a surface *of a building*" (emphasis added); states that the "intermediate file" is an "intermediate raster file"; states that the dots in that intermediate raster file are "arranged according to a predetermined grid and selected

---

[3] The only other differences between claims 17 and 18 appear to be typos. Claim 18 includes headings for step (e) and step (g), but not for step (f), even though the text in the line immediately below step 18(e) is identical to the text in claim 17(f). *See* Reexam. Cert. col 4 ll. 12-14. The final clause in step 17(g), meanwhile—"thereby *transferring* the representation to the surface" (emphasis added)—reads as follows in step 18(g): "thereby the representation to the surface."

ones of the dots are left blank according to the image"; and states that the "features" of the surface to be accommodated by the user's "manipulation" of the dots include "windows, doors, and edges of the sub-components". *Id.* col. 8 ll. 35-58.

Most of the dependent claims add similar details to the independent claims on which they depend. Claims 2, 5-6, and 9-10 are dependent on claim 1, and each adds a slightly different combination of the details from claim 11 to claim 1. *See* '688 patent col. 8 ll. 7-34; Reexam. Cert. col. 1 ll. 44-63.[4] Claims 7 and 8 are also dependent on claim 1, but they add details not included in claim 11. These claims expressly refer to the manipulation and assembly of the sheets themselves. Thus, claim 7 states that "each sheet having multiple types of markings is manipulated by the machine using multiple separate control files." Reexam. Cert. col. 1 ll. 58-62. Claim 8 adds "the step of assembling the sheets adjacent a building, thereby transferring a representation of an image to a surface of a building." '688 patent col. 8 ll. 26-28.

Claims 12 and 13, both dependent on claim 11, similarly add details relating to the manipulation and assembly of the sheets. In claim 12, "each one of the sheets requiring multiple types of marking is manipulated by the machine using multiple separate control files." Reexam. Cert. col. 2 ll. 22-29. Claim 13 adds "the steps of forming edge portions of at least some of the sheets into flanges; and assembling the sheets adjacent the building by attaching the flanges to at least one of each other and the building."[5] *Id.* col. 2 ll. 30-36.

---

[4] Claim 2, for example, adds the detail that the dots in the intermediate file are "positioned according to a predetermined grid." Claims 5 and 6 both add the details that "each of the dots represent [sic] a marking to be applied to the surface," and that those markings "are selected from the group consisting of indentations, holes, bumps, and blanks according to the image." Reexam. Cert. col. 1 ll. 44-47, 52-53. In claim 6, the markings also "are positioned according to a predetermined grid" and "vary in size according to the image." *Id.* col. 1 ll. 48-51.

[5] The patent does not define the word "flanges." Nor does the patent include an image of a "flange." The specifications, however, refer to "form[ing]" the "edges of the sheets . . . into flanges that may be used to secure the sheets together and adjacent the building." '688 Patent, col. 4 ll. 33-35. The specifications further explain that "[t]he flanges of the sheets may be welded, bolted, or otherwise attached together, such as by using an adhesive." *Id.* col. 6 ll. 2-4.

## II. Procedural history

Zahner initiated this action on May 31, 2017. Its Amended Complaint [40] alleges that Hendrick's "method" for manufacturing "custom perforated-metal installations . . . infringes at least claims 1, 2, 5, 6, 7, 8, 9, 11, 12, 13, 17, and 18" of the '688 patent. (Am. Compl. ¶ 2.) Hendrick has filed a motion for judgment on the pleadings [24] under Rule 12(c), arguing that the patent is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

## **DISCUSSION**

Motions for judgment on the pleadings under Rule 12(c) are governed by "the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Lodholtz v. York Risk Services Group, Inc.*, 778 F.3d 635, 639 (7th Cir. 2015); *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1336 (Fed. Cir. 2017) ("procedural aspects" of Rule 12(c) motion governed by "the law of the regional circuit"). A plaintiff must "state a claim to relief that is plausible on its face." *Lodholtz*, 778 F.3d at 639 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the court construes the pleadings "in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in [the nonmoving party's] favor," *Berger v. Nat'l Coll. Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016), it need not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Patent Act states that, with certain exceptions, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore." 35 U.S.C. § 101. The '688 patent claims a process that appears, at first glance, to meet the textual requirements for subject-matter eligibility. But section 101 "contains an important implicit exception: laws of nature, natural phenomena, and abstract ideas are not patentable." *Vanda Pharmaceuticals Inc. v. West-Ward Pharmaceuticals Int'l Ltd.*, 887 F.3d 1117, 1133 (Fed. Cir. 2018) (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 70 (2012)). In its motion for judgment on the

9

pleadings, Defendant argues that each of the asserted claims in the '688 patent is impermissibly abstract, and therefore does not recite patent-eligible subject matter under 35 U.S.C. § 101

The U.S. Supreme Court has established a two-step framework for determining whether the abstract-ideas doctrine makes a claimed process patent-ineligible. At step one of this framework, the court must decide whether the claims at issue are "directed to" an abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). At step two, the court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible *application* [of the abstract idea]." *Id.* (quoting *Mayo*, 566 U.S. at 78) (emphasis added). This two-step analysis is designed to ensure that patent law provides adequate rewards for innovation, but does not "grant a monopoly" over "the basic tools of scientific and technological work." *Id.*

**I.** *Alice* **step one**

This court's first task is to determine whether the asserted claims are "directed to" an abstract idea. This determination involves "looking at the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citation omitted). Neither the Supreme Court nor the Federal Circuit applies "definitive rule[s] to determine what constitutes an 'abstract idea.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). Instead, courts are to be guided by precedent—that is, they are "to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Id.*

In several recent cases, courts have found claims directed to the general concepts of collecting, displaying, and analyzing data to be abstract. In *Intellectual Ventures I LLC v. Capital One Finance Corp.*, for example, the Federal Circuit considered the validity of a patent that "concern[ed] a system and method for editing XML documents." 850 F.3d 1332, 1339 (Fed. Cir. 2017). The method purportedly allowed users "to view and update XML documents in different formats," and to "manipulate the data and perform actions without programming skills." *Id.* It did this by "presenting the user with a second document—the 'dynamic document'—which is based

upon data extracted from the original XML document." *Id.* The data in this "dynamic document" would be stored in a different format from the original XML document, but when a user modified the data in the dynamic document, the changes would be "detected" by "a component" that would then make similar modifications to the original XML document. *Id.* at 1339-40. The court found the claimed method to be abstract because it was directed broadly to the "concept of collecting, displaying, and manipulating data of particular documents." *Id.* at 1341.

So too in *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, which involved claims "directed to a device profile and a method for creating a device profile within a digital image processing system." 758 F.3d 1344, 1347 (Fed. Cir. 2014). The function of the "device profile" was to facilitate the transfer of a digital image's pixel data from one device to a second device having different "spatial properties and color properties" from the first device. *Id.* at 1348. The claimed three-step method involved collecting data about the first device's color and spatial properties, and then combining those two data sets to create the device profile. *Id.* at 1351. A generic "process of combining two data sets," the court explained, is abstract. "Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible." *Id.*

In *Enfish, LLC v. Microsoft Corp.*, by contrast, the Federal Circuit concluded that several patents describing computer database software were *not* directed to abstract ideas. 822 F.3d 1327, 1330 (Fed. Cir. 2016). That patents at issue were "directed to an innovative logical model for a computer database." *Id.* at 1330. Prior logical models "explain[ed] how the various elements of information are related to one another," and "generally result[ed] in the creation of particular tables of data." *Id.* The claimed "self-referential" database improved on these logical models by "stor[ing] all entity types in a single table" and "defin[ing] the table's columns by rows in that same table." *Id.* at 1332. This "indexing technique . . . allows for faster searching of data" and "more effective storage" of certain types of data. *Id.* The court found the claims to be non-abstract because they were "directed to a specific improvement to computer functionality," rather than

11

mere "generalized steps to be performed on a computer using conventional computer activity." *Id.* at 1338. Unlike the claims in *Digitech*, the court explained, which "recited generalized steps to be performed on a computer using conventional computer activity," the claims in *Enfish* involved "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." *Id.* at 1339.

The claims in this case are more like those in *Digitech* and *Intellectual Ventures* than *Enfish*. The "focus" of all the claims in the '688 patent is a method for collecting two types of data—an image and information about a surface—and then using a computer to convert that data into machine code that is usable for transferring the image to the surface. This is what the title of the patent is directed to (i.e., a "computer program and method for converting an image to machine control data"); this is what the specifications are directed to (i.e., a computerized alternative to "tedious" and error-prone human generation of machine code); and this is what the claims are directed to (i.e., steps describing the use of a computer to collect, combine, and manipulate the two types of information to generate machine code).[6] Nothing in the patent suggests a specific improvement over existing methods for generating machine code—beyond the use of "general purpose computer components" rather than the human hand—or a "specific improvement to computer to computer functionality." *Enfish*, 822 F.3d at 1338-39. *See also RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (claim "directed to the abstract idea of encoding and decoding image data"), *cert. denied*, 138 S. Ct. 672 (2018); *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (claims abstract where "focus . . . is on collecting information, analyzing it, and displaying certain results of the collection

---

[6] Although the claims do add certain limitations—the "intermediate file," for example, must comprise a series of dots—and therefore "add a degree of particularity," these details do not make the underlying "concept" of the claims any less abstract. *See Ultramercial, Inc v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014). These details do matter for patent-eligibility, but they matter at step two of the *Alice/Mayo* framework, when the court considers whether any "additional elements" in the claims amount to an "inventive" application of the underlying abstract idea. *See Market Track LLC v. Efficient Collaborative Retail Marketing, LLC*, No. 14 C 4957, 2015 WL 3637740, at *5 (N.D. Ill. June 12, 2015) (Tharp, J.).

and analysis); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (claims abstract because "drawn to the basic concept of data recognition and storage").

Zahner attempts to distinguish these holdings by suggesting that they all "involved truly abstract data-collection and -organization processes without tangible, physical, real-world applications." (Pl.'s Resp. Br. 10.) The claims in the '688 patent are different, Zahner argues, because they "are directed to the physical manipulation of a solid building surface." (*Id.* at 7.) Zahner analogizes this case to *Chamberlain Group, Inc. v. Linear LLC*, where another court in this district deemed non-abstract a series of claims "directed to opening and closing a movable barrier (e.g., a garage door) using a computer network for communication between the monitor or operator . . . and movable barrier." 114 F. Supp. 3d 614, 625 (N.D. Ill. 2015) (St. Eve, J.).

Zahner's characterization of the '688 patent is misleading, and the analogy to *Chamberlain* inapt. It is true that the '688 patent refers, in several locations, to the physical manipulation of a surface. And the court recognizes that claims 7, 8, 12, and 13 add a final step (or steps) to the claimed process, requiring a surface to be manipulated. But even when the court reads the patent in the light most favorable to Zahner, and assumes that all the claims require the manipulation of a building surface in addition to the generation of machine code, this physical manipulation is not what the claims are "directed to." Rather, the physical manipulation of a surface is the *application* of the claimed process for generating machine code. As the Supreme Court made clear in *Alice*, "[s]tating an abstract idea while adding the words 'apply it' is not enough for patent eligibility." 134 S. Ct. at 2358 (citations omitted).

The claims' references to physical manipulation of a surface are relevant to the court's analysis, but they are relevant at step two of the *Mayo*/*Alice* framework, when the court asks whether these and other "additional elements" in the claims amount to an "inventive" application of the underlying abstract idea. *Chamberlain* itself is instructive on this point, as the patent at issue in that case claimed both a method *and the specific physical apparatus*—that is, the garage-

door opener connected to the internet—with which the method was to be applied. *See Chamberlain*, 114 F. Supp. 3d at 618. Zahner does not similarly claim any of the physical objects or components mentioned in the '688 patent, such as a machine that reads the code generated by Zahner's claimed process and uses it to punch holes in the applicable surface.

Zahner also points to two other cases from this district, but neither alters the court's analysis. *Baxter International, Inc. v. Carefusion Corp.* is similar to *Chamberlain*, in that it involved claims directed not only to a method, but also to the specific device with which that method would be implemented. *See* No. 15-cv-09986, 2016 WL 2770787 (N.D. Ill. May 13, 2016) (St. Eve, J.). In *Trading Technologies International, Inc. v. CQG, Inc.*, meanwhile, the court considered whether a patent claiming a method for trading commodities on an electronic exchange was abstract. *See* No. 05-cv-4811, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015) (Coleman, J.), *aff'd*, 675 F. App'x 1001 (Fed. Cir. 2017). The court rejected the defendant's argument that the claims were directed to merely "setting, displaying, and selecting" data or information with a computer. *Id.* at *4. In fact, the claimed method involved displaying certain prices at a static position but "allow[ing] the quantities at each price to change." *Id.* This specific *improvement* in how a computer sets, displays, and selects market data was what the claims were directed to. *Id.* Zahner's claims are not similarly directed to a specific improvement in how a computer generates machine control data. Rather, they are directed to the abstract idea of using a computer, instead of human labor, to combine two types of data to form machine code.

## II.    *Alice* step two

That the claims in the '688 patent are directed to an abstract idea does not necessarily make them patent-ineligible. At step two of the *Alice* framework, the court must consider whether the claims "do significantly more than simply describe [the] abstract method." *Intellectual Ventures I*, 850 F.3d at 1341 (quoting *Ultramercial*, 772 F.3d at 715). If the claims include "additional features" that add "inventive concept," the claims are "eligible for patenting even if they are directed to an abstract idea." *Id.* Any such "inventive concept must be evident in the claims."

14

*Recognicorp*, 855 F.3d at 1327. Put differently, process claims directed to an abstract idea are nevertheless patent-eligible if the claim elements, considered "both individually and 'as an ordered combination,'" provide details about how to apply that abstract idea in a way that is not "well-understood, routine, [or] conventional." *Alice*, 134 S. Ct. at 2355, 2359.

Claims reciting a process using purely functional or conclusory language have been found to lack the requisite inventive concept. In *Intellectual Ventures I*, for example, the Federal Circuit found that the claimed process for "collecting, displaying, and manipulating XML data" did not add inventive concept because the claims did not specify *how* the actions described in each step would be performed. Instead, the actions were simply attributed to "a series of generic computer 'components' that merely restate their individual functions—i.e., organizing, mapping, identifying, defining, detecting, and modifying." 850 F.3d at 1341. When the actions were considered together, moreover, they "merely reiterate[d] the patent's stated goal itself," providing a "results-oriented solution, with insufficient detail for how a computer accomplishes it." *Id.* at 1342.

In *Digitech*, meanwhile, the Federal Circuit found no additional inventive concept in claims directed to the abstract idea of collecting information about a digital device's spatial and color properties and then combining that information into a "device profile." *See* 758 F.3d at 1350-51. Like the claims in *Intellectual Ventures I*, the claims in *Digitech* provided little detail about *how* that information would be collected or *how* the information would be "combined" to form a device profile. The device's color properties, for example, would be collected "through use of measured chromatic stimuli and device response characteristic functions." *Id.* at 1351. Similarly, the information about spatial properties would be collected "through use of spatial stimuli and device response characteristic functions." *Id.* And the claims said nothing at all about how the information would be "combin[ed] . . . into a device profile." *Id.* As recited in the claims, these actions simply occurred, and therefore added no inventive concept to the underlying abstract idea.

Process claims also lack inventive concept if they describe only "well-understood, routine, [or] conventional" actions. *Alice*, 134 S. Ct. at 2359. In *Electric Power Group, LLC v. Alstom S.A.*,

15

for example, the claims at issue were directed to the abstract idea of collecting, analyzing, and displaying real-time data about the status of a power grid.  830 F.3d 1350 (Fed. Cir. 2016).  Although the claims provided highly detailed descriptions of the "types of information and information sources available within the power-grid environment," they said nothing new about how the information would be collected or assembled.  *Id.* at 1355.  They did not "require an arguably inventive set of components or methods, such as measurement devices or techniques, that would generate new data."  *Id.*  Nor did they "invoke any assertedly inventive programming."  *Id.*  Referring to generic "computers, networks, and displays" was not enough to add inventive concept, because the claims did not "require any nonconventional computer, network, or display components, or even a 'non-conventional and non-generic arrangement of known, conventional pieces.'"  *Id.* (quoting *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)).  *Compare OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363-64 (Fed. Cir. 2015) (no inventive concept added by claims requiring the sending of electronic messages over a network, the collection of data about "customer reactions," the "storing [of] test results in a 'machine-readable medium,'" and the "present[ation] [of offers] to potential customers"), *with DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014) (inventive concept added by claims calling for web server that "directs the visitor to an automatically-generated hybrid web page that combines visual 'look and feel' elements from the host website and product information from the third-party advertisement").

### a. Claims 1, 8, 17, and 18

In this case, asserted claims 1, 8, 9, 17, and 18 lack sufficient detail about how the underlying abstract idea is implemented.  The first steps in all these claims involve "receiving the image as an image file" and "converting the image file to an intermediate file."  Like the final step of the process in *Digitech* ("combin[ing]" two data sets "into a device profile"), 758 F.3d at 1351, these steps provide no instruction on how the described actions ("receiving" and "converting") occur—they just do.  Although the claims tell us something about *what* the resulting intermediate

16

file contains ("a series of dots that vary in dimensional size according to the image"), we have no information at all about *how* the conversion to that format takes place. The basic concepts of receiving images and converting them into computer files comprising a series of dots are themselves abstract, and do not amount to an inventive application of the underlying abstract idea in this case.

The next steps in the claimed process--"displaying and manipulating the dots to accommodate features of [a] surface," and "converting the intermediate file into at least one control file"—are equally bereft of detail. The claims again provide no information at all about how the dots are "displayed" or "manipulated," or how the intermediate file is subsequently "converted" into a control file. All we know is that the manipulation (however it occurs) accommodates (somehow) the features of a surface, and that the manipulated file is (somehow) converted into another file. And although certain general characteristics of the resulting control file are described (it is "operable to be utilized by a machine to physically manipulate [a] surface according to the dots"), the claim language does not explain what being "operable" by such a generic machine involves. The act of creating a computer file containing code that can be read by another machine does not add inventive concept.

The remaining steps in claims 1, 8, 17, and 18 are slightly more detailed—but only slightly. All the claims involve the step of "scaling the intermediate file to the surface," which, we are told, is to be accomplished "by dividing the intermediate file into a plurality of sub-components." Each of these sub-components, in turn, "corresponds to one of a plurality of individual sheets that are to be combined to form the surface." Again, however, the patent offers no information about how the "dividing" occurs. Nor does it explain what "correspond[ing]" to a sheet involves. The acts of splitting an image into multiple pieces and subsequently enlarging those pieces do not add inventive concept. Claim 8 adds an additional step: "assembling the sheets adjacent a building." But it does not provide any details about how the sheets are to be assembled. The act of assembling sheets is not, on its own, inventive.

17

The claims are no more inventive when their steps are considered together as an ordered combination. Plaintiff argues that one "inventive step" in this case is "the incorporation of an intermediate file into the method, as a bridge between the original image file and the machine code known in the prior art." (Pl.'s Resp. Br. 16.) But all the intermediate file does is display information on a computer so that it can be manipulated by the user. The fact that this involves the creation and manipulation of a "file" is merely a consequence of carrying out the action on a computer. Using a generic computer to "eliminate[ ] inefficiencies in the prior art"—as Plaintiff characterizes its invention (*Id.*)—is not enough. See *Alice*, 134 S. Ct. at 2358 ("[I]f a patent's recitation of a computer amounts to a mere instruction to 'implement[t]' an abstract idea 'on . . . a computer,' that addition cannot impart patent eligibility.") (citation omitted). Even when the court reads claims 1, 8, 17, and 18 most favorably to Plaintiff, and assumes that the intermediate file must be used in the course of "transforming flat metal into three-dimensional artwork with bumps, indentations, and holes" (Pl.'s Reply Br. 17), limiting the claimed invention to this field of use is not enough to make it patent-eligible. See *Bilski v. Kappos*, 561 U.S. 593, 612 (2010) ("[L]imiting an abstract idea to one field of use or adding token postsolution components [does] not make the concept patentable"); *Intellectual Ventures I*, 850 F.3d at 1340 (limiting claimed process's "field of use" did not "render an otherwise abstract concept any less abstract").

Plaintiff analogizes the use of the intermediate file in its claimed process to the display of price information in *Trading Technologies International*. But that case involved claims that specified exactly how the prices were to be displayed, and the court found that this specific arrangement of information was what added inventive concept. See *Trading Techs. Int'l*, 2015 WL 774655, at *5. Claims 1, 8, 17, and 18, by contrast, require only that the information be displayed in the form of "a series of dots that vary in dimensional size according to the image." Using a generic computer to create a series of dots that resembles another image is entirely conventional (as any reader of the *Wall Street Journal* knows), and thus is not analogous to the inventive concept at issue in *Trading Technologies*.

The court concludes that claims 1, 8, 17, and 18 do nothing more than recite an abstract idea, and therefore are not patent-eligible under 35 U.S.C. § 101. Defendant's motion for judgment on the pleadings is granted with respect to those claims.

### b. Claims 2, 5-7, 9, and 11-13

The court reaches a different conclusion, however, with respect to claims 2, 5-7, 9, and 11-13. Those claims provide certain details about the ways in which the dots in the intermediate file are displayed, the ways in which the dots are manipulated, or the ways in which the sheets produced by the machine are assembled. These requirements appear to meaningfully limit the scope of the claims. Claim 2, for example, limits the claim to the use of an intermediate file in which the dots are "positioned according to a predetermined grid." It is possible, of course, that this specific limitation is "well-understood, routine, [or] conventional," and is thus insufficient to add an inventive concept under the *Alice* framework. *See* 134 S. Ct. at 2359. But the parties do not discuss this or any of the other additional limitations in claims 2, 5-7, 9, or 11-13. The court therefore has no basis from which it can decide whether these limitations are, in fact, "well-understood, routine, [or] conventional." It would be inappropriate to grant judgment on the pleadings in these circumstances, as the court is required to draw all reasonable inferences in the non-movant's favor.

## CONCLUSION

Defendant's motion for judgment on the pleadings [24] is granted in part and denied in part. The motion is granted with respect to claims 1, 8, 17, and 18, as those claims are directed to an abstract idea to which they do not add any inventive concept. The motion is denied with respect to claims 2, 5-7, 9, and 11-13, because Defendant has not met its burden of demonstrating that the additional limitations in these claims are without inventive concept.

ENTER:

Dated: July 20, 2018

REBECCA R. PALLMEYER
United States District Judge